IN THE MATTER OF: J.M.E.
No. COA08-821
Court of Appeals of North Carolina
Filed December 16, 2008
This case not for publication
E. Marshall Woodall, for petitioner-appellee, Harnett County Department of Social Services.
Pamela Newell Williams, for Guardian Ad Litem.
Richard E. Jester, for respondent-appellant.
CALABRIA, Judge.
Respondent-mother appeals from an order terminating her parental rights to her son J.M.E ("the minor child"), born in 2005. We affirm.

I. Facts
Harnett County Department of Social Services ("DSS") was involved with respondent-mother since 2000. In 2003, DSS removed respondent-mother's two daughters, E.C.M and M.M.M, from the home based on substantiated reports of abuse and neglect. E.C.M. and M.M.M. were adjudicated dependent juveniles. At the request of DSS, psychologist Dr. Maria Lapetina ("Dr. Lapetina") evaluated respondent-mother in 2004 to determine respondent-mother's ability to parent her daughters. Dr. Lapetina found that respondent-mother's I.Q. was 65, which is in the "extremely low range of intelligence." Respondent-mother was diagnosed with post-traumatic stress disorder, dependent personality disorder and mental retardation. Dr. Lapentina also found that respondent-mother would be compliant with her treatment recommendations, but respondent-mother's "ability to comprehend or process what she is told is questionable." Dr. Lapentina concluded that respondent-mother's prognosis was "poor;" that her ability to parent and protect her daughters "is very limited;" and that respondent-mother will need "constant supervision in order to maintain the degree of acceptable conduct needed to care for her children."
Upon learning of the minor child's birth, DSS entered into a safety agreement with respondent-mother and respondent-father. Pursuant to the safety agreement, the parents agreed that the minor child would not be left alone with respondent-mother. Shortly thereafter, a DSS social worker found respondent-mother home alone with the minor child and found the newborn lying face down on a pillow on an adult bed. In March of 2005, DSS filed a juvenile petition alleging that the minor child was a neglected juvenile. DSS took nonsecure custody of the minor child and subsequently filed a petition to terminate respondent-mother's parental rights as to her daughters.
The Harnett County District Court conducted a hearing on the neglect petition and the termination petition. On 9 November 2005, the trial court adjudicated the minor child a neglected juvenile and awarded DSS custody of the minor child under a plan of reunification. The trial court also terminated respondent-mother's parental rights to her two daughters on the grounds of neglect, willfully leaving the children in foster care, failure to pay child support and dependency. Respondent-mother appealed the adjudication and disposition order as to the minor child and the termination orders as to her daughters. This Court dismissed respondent-mother's appeal. See In re J.M.E., ___ N.C. App. ___, 645 S.E.2d 230 (2007) (unpublished).
The trial court conducted a review of custody and placement hearing as to the minor child in December of 2005 and a permanency planning hearing in May of 2006. DSS provided services to respondent-mother and respondent-father under the reunification plan. The trial court allowed respondent-mother and respondent-father to have extended unsupervised visitation with the minor child. In February 2007, the trial court ceased reunification efforts and changed the permanent plan from reunification to adoption.
DSS filed a motion to terminate the parental rights of respondent-mother and respondent-father. As to respondent-mother, DSS alleged the following five statutory grounds for termination under N.C. Gen. Stat. § 7B-1111(a): (1) neglect; (2) willfully left the child in foster care for more than twelve months without showing that reasonable progress had been made under the circumstances; (3) failure to pay cost of care; (4) that respondent-mother was incapable of providing for the proper care or supervision of the child and there was a reasonable probability that such incapability would continue for the foreseeable future; and (5) respondent-mother's parental rights had been terminated involuntarily with respect to another child. N.C. Gen. Stat. § 7B-1111(a)(1-3),(6),(9) (2007).
On 18 January 2008, the trial court held a hearing on the termination motion. DSS presented testimony from psychologist Dr. Lapetina and foster care social worker Terry Manahan ("Manahan"). On 19 March 2008 the trial court entered an order terminating respondent-mother's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1), (a)(2), (a)(6), and (a)(9). The trial court also terminated the parental rights of the father, who is not party to this appeal. From the order of termination, respondent-mother appeals.

II. Analysis
A termination of parental rights proceeding is conducted in two phases: (1) adjudication and (2) disposition. In re Blackburn, 142 N.C. App. 607, 610, 543 S.E.2d 906, 908 (2001). In the adjudication phase, the petitioner has the burden of proving by clear, cogent, and convincing evidence that one or more of the statutory grounds for termination under N.C. Gen. Stat. § 7B-1111(a) exists. Id. If a petitioner meets its burden of proving one or more statutory grounds for termination, the trial court then moves to the disposition phase where it must decide whether termination is in the child's best interests. Id.

A. Admission of Evidence: Relevance
As a preliminary matter, respondent-mother contends the trial court erred by allowing Dr. Lapetina to testify about the results of respondent-mother's 2004 evaluation. She argues that the evaluation was "far too remote in time to be relevant to the present case." We disagree.
Our Supreme Court has stated that in a termination of parental rights hearing, "the trial court must admit and consider all evidence of relevant circumstances or events which existed or occurred either before or after the prior adjudication of neglect." In re Ballard, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984)(emphasis omitted). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2007).
Here, Dr. Lapetina's testimony about respondent-mother's intellectual capacity was relevant to the issue of whether respondent-mother could effectively parent a child. The date of the evaluation goes to the weight the trial court should have given the evidence.See Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 461, 597 S.E.2d 674, 688 (2004) (holding that once a court determines scientific area of qualified expert is reliable, then remaining issues concerning quality of conclusions go to the weight of the evidence rather than admissibility). Accordingly, this assignment of error is overruled.

B. Grounds to Terminate Parental Rights
Respondent-mother challenges the trial court's determination that grounds existed to terminate her parental rights. We first address her arguments under N.C. Gen. Stat. § 7B-1111(a)(9). A parent's rights can be terminated when the parental rights with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home. N.C. Gen. Stat. § 7B-1111(a)(9) (2007). Termination under this section necessitates findings regarding two separate elements: (1) involuntary termination of parental rights as to another child and (2) inability or unwillingness to establish a safe home.
Here, respondent-mother does not dispute that her rights to her daughters were terminated by a court of competent jurisdiction. Respondent-mother challenges the second element, arguing that she "has been both willing and able" to establish a safe home. As to the second element, the trial court made the following pertinent findings of fact:
20. The juvenile herein was born to the mother and father on February 3, 2005. After investigating the fact that the mother had given birth to a newborn, DSS entered into a safety agreement with the parents that the newborn would not be left alone with the mother in her sole care for any period of time. During a home visit, the social worker [Sara Messer] discovered the mother at home alone with said infant and further found the newborn juvenile in a dangerous position (face down on a pillow on an adult bed).
21. The mother failed to demonstrate that she had improved her parental ability to take appropriate steps to comprehend dangerous situations and take proper care of the juvenile herein to assure that child's safety, notwithstanding the various hours of parenting and other classes at MCDS. The mother and father violated the safety plan mentioned above.
. . .
30. During the extended home visits on an unsupervised basis, certain concerns were observed by both the social worker and the GAL. On June 16, 2007 [sic], the juvenile returned to the foster home with 15 insect bites and dirty fingernails, ears and clothes. No medical attention was given the child by the parents. During the visitation period from June 29, 2006 to July 9, 2006, the juvenile was observed with blisters on his buttocks and a very bad diaper rash and his milk in the diaper bag was spoiled. The social worker advised the mother to obtain over-the-counter medication and take it to the daycare; the mother called the father who had to leave work to obtain the medication. After extended visits an over abundance of baby powder was noticed in his diaper which caused the retention of moisture and contributed to the diaper rash. On or about August 6, 2006, the parents reported an abrasion on the juvenile's forehead the size of a 50 cent piece. No explanation was given as to how the abrasion occurred. On August 20, 2006, the child returned from an extended visit with another abrasion or bruise [50 cent size] on the right side of his forehead above his eye and a nickel sized red raised area to the back of his left calf [leg]. No medical attention was sought by the parents. The explanations by the parents as to what had happened were varied and not consistent. On September 3, 2006, a DSS on-call placement worker observed a "red swollen bump on his left forehead near his temple the size of a thumb." The explanations given by the parents were varied and not consistent. Upon investigation by the social worker, the lady who was caring for the child while his father was at work stated that she had not seen any bruises or scratches on the child. The above mentioned injuries are apparently occurring during Sunday while the child is in the care of the parents.
34. The respondent mother is so limited in matters of judgment that the child will not be safe if placed in her custody and control.
An examination of the record shows the above findings are supported by court orders, court reports and testimony from Manahan. Mananhan testified the minor child's injuries were discovered upon his return to the foster home and noted the parents' different explanations for the injuries. Manahan also testified the parents lacked an ability to plan ahead for the child's safety and well being as evidenced by the severe diaper rash and spoiled bottle of milk. Manahan acknowledged that respondent-mother completed every task he assigned. However, he also testified that a week after he would talk to respondent-mother about certain issues, she "wouldn't remember or wouldn't process what we'd already discussed."
These findings of fact are sufficient to support the second element of § 7B-1111(a)(9). Respondent's inability to apply the parenting skills she learned, her failure to adequately supervise the minor child during visitation, and failure to seek medical attention, all support the trial court's determination that respondent mother lacks the ability or willingness to establish a safe home for the minor child.See In re V.L.B., 168 N.C. App. 679, 684, 608 S.E.2d 787, 791, disc. review denied, 359 N.C. 633, 614 S.E.2d 924 (2005) (parents unable to establish a safe home due to unstable mental health history and domestic violence coupled with Michigan termination of rights to other children, supported conclusion that grounds to terminate parental rights existed undersubsection (a)(9)). Since we determined the trial court properly found grounds existed under N.C. Gen. Stat. § 7B-1111(a)(9), we do not address respondent-mother's arguments regarding the remaining grounds. See In re Pierce, 67 N.C. App. 257, 261, 312 S.E.2d 900, 903 (1984) (a finding of one statutory ground is sufficient to support the termination of parental rights).

C. Best Interests
Respondent-mother also contends the trial court abused its discretion in concluding during the dispositional stage that the termination of her parental rights was in the best interests of the minor child. We disagree.
In determining whether terminating the parent's rights is in the juvenile's best interests, the court shall consider the following:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen. Stat. § 7B-1110 (2007).
In a proceeding to terminate parental rights, a trial court's determination of the minor child's best interests lies within its sound discretion and is reviewed only for abuse of discretion. In re J.A.P., ___ N.C. App. ___, ___, 659 S.E.2d 14, 21 (filed April 15, 2008) (No. COA07-1562). An abuse of discretion exists when the challenged actions of the trial court are manifestly unsupported by reason. In re R.B.B., ___ N.C. App. ___, ___, 654 S.E.2d 514, 521 (filed Dec. 18, 2007) (No. COA07-727), review denied, 362 N.C. 235, 659 S.E.2d 738 (2008).
The trial court made the following findings of fact to support the court's determination that it was in the best interests of the minor child to terminate respondent-mother's parental rights:
39. The relationship between the juvenile and his parents has been demonstrated by the lack of their presence when unsupervised visits were scheduled from Thursday through the weekend. The purpose of those visits was not only to give the parents an opportunity to demonstrate their skill and ability to properly care for the juvenile but also to advance their relationship and bond with the juvenile. The father took on a second job and was not present except on Sunday. The mother elected to not be present when the juvenile was being cared for in the child care facility and the home of the friend.
40. The juvenile has been in the foster home where one of his biological siblings is located. This placement in care has been continuous since March 9, 2005. Since the juvenile has been in care, he has adjusted well and thrived in said placement. The juvenile has progressed considerably since placement in DSS care. The quality of the relationship between the juvenile and the foster family has been good; the foster parent has expressed the desire to adopt the juvenile.
41. The age of the juvenile, together with the extended experience of the foster home and the expressed desire of the foster parent create the likelihood of the juvenile's early adoption.
42. After an extended period for reunification efforts, the court established the juvenile's permanent plan as adoption. The termination of the parent's rights will aid in accomplishing this plan.
43. It is in the best interest of the juvenile for the rights of the parents to be terminated.
A review of the record shows that the above findings of fact are based upon reports from DSS and from the Guardian ad Litem, as well as Manahan's testimony. Based upon these findings, we conclude that the trial court did not abuse its discretion in its determination that terminating the parental rights of respondent-mother was in the best interest of the minor child.

D. Entry of Order
Finally, respondent-mother contends the trial court committed reversible error by entering its termination order sixty days after the hearing in violation of N.C. Gen. Stat. § 7B-1110(a). We disagree.
Section 7B-1110(a) provides that "[a]ny order shall be reduced to writing, signed and entered no later than 30 days following the completion of the termination of parental rights hearing." N.C. Gen. Stat. § 7B-1110(a)(2007). If the order is not entered within thirty days, the clerk of court is required to calendar the case for a hearing to determine why the order has not been entered, and the court is required to enter the order within ten days of that hearing. Id. A respondent must show prejudice to prove reversible error. See In re C.J.B. & M.G.B., 171 N.C. App. 132, 135, 614 S.E.2d 368, 370 (2005).
Here, the trial court held the termination hearing on 18 January. Its order should have been entered by 18 February 2008 and not on 19 March 2008. However, respondent-mother has not shown prejudice by the twenty-nine day delay. We also note that, pursuant to a recent holding by the North Carolina Supreme Court, when a trial court fails to adhere to statutory time lines, the appropriate and more timely remedy is mandamus rather than an appeal. See In re T.H.T., ___ N.C. ___, ___, 665 S.E.2d 54, 59 (2008). Respondent-mother's argument is without merit.

III. Conclusion
For the foregoing reasons, we affirm the trial court's order terminating the parental rights of respondent-mother.
Affirmed.
Judges WYNN and BRYANT concur.
Report per Rule 30(e).